IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Anthony M. Aiken, ) | |
| ) | Civil Action No. 6:04-22040-MBS-WMC |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Jo Anne B. Barnhart, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)((B).[1]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. Sections 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security Administration denying his claims for disability insurance benefits (DIB) and supplemental security income (SSI) payments.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed applications for DIB and SSI on April 18, 2001, alleging a disability onset date of April 9, 2001, due to problems as a result of a gunshot wound to the head resulting in dizziness, blurred vision, severe headaches, and seizures (Tr. 14). His claim was denied initially and upon reconsideration (Tr. 26-37). The plaintiff then requested a hearing before an administrative law judge (ALJ) which was held August 1, 2003 (Tr. 194-

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

255). On October 28, 2003, the ALJ issued a decision denying the plaintiff's claims and made the following findings (verbatim):

> (1)  The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.
>
> (2)  There is insufficient evidence to find that the claimant has engaged in substantial gainful activity since the alleged onset of disability.
>
> (3)  The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 C.F.R. § 404.1520(b) and 416.920(b).
>
> (4)  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
>
> (5)  The claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.
>
> (6)  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 C.F.R. § 404.1527 and 416.927).
>
> (7)  The claimant has the residual functional capacity to perform a reduced range of light exertion work with limitations described in the body of this decision.
>
> (8)  The claimant is unable to perform any of his past relevant work.  (20 C.F.R. § 404.1565 and 416.965).
>
> (9)  The claimant is a "younger individual between the ages of 18 and 44" (20 C.F.R. § 404.1563 and 416.963).
>
> (10)  The claimant has a "limited education" (20 C.F.R. § 404.1564 and 416.964).
>
> (11)  The claimant has no transferable skills from any past relevant work (20 CFR § 404.1568 and 416.968).
>
> (12)  The claimant has the residual functional capacity to perform a significant range of light work (20 C.F.R. § 416.967), as described in the body of this decision.

> (13)   Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.18 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs and their numbers, as the vocational expert testified, are listed above.
>
> (14)   The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision  (20 C.F.R. § 404.1520(f) and 416.920(f)).

(Tr. 21-22).

On June 22, 2004, the Appeals Council denied the plaintiff's request for review, thus making the ALJ's decision the Commissioner's "final decision" for purposes of judicial review (Tr. at 5-7).  *See* 42 U.S.C. §405(g); 20 C.F.R. §404.981 (2003).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **EVIDENCE PRESENTED**

The plaintiff was born on April 11, 1963; he was 37 years old at the time of his alleged onset of disability and 40 years old at the time of the ALJ's decision (Tr. 42).  He has a ninth-grade education and past relevant work experience as a carpenter, a construction laborer, and a forklift operator (Tr. 60, 65, 68).  He alleges disability due to the residual effects of a remote gunshot wound to the head, including dizziness, blurred vision, headaches seizures and inability to "keep [his] head raised long" (Tr. 41-44, 59, 177-82).

### *Medical Evidence*

The plaintiff has a history of hospitalization for a gunshot wound to the head in 1983, during which he underwent a craniotomy, decompression, and evacuation of intracerebral hematoma, bone fragments, and necrotic tissue (Tr. 105-107).

3

The treatment notes of Anmed Health Family Medicine Associates – Honea Path, Honea Path, South Carolina, including those of M. Kent Jenkins, M.D., between June 4, 2001, and June 16, 2003, revealed treatment with medication for seizures, low back pain, and anxiety, and complaints of headaches and dizziness (Tr. 141-52, 168-76). During this period, the plaintiff reported good right eye vision and an injury with a fish hook in the left eye resulting in a left eye visual deficit (Tr. 151). He also reported mowing with a riding mower, attending church services, and staying active (Tr. 141, 143, 145). On June 4, 2001, he reported that, without medication, he experienced seizures only once or twice yearly until the previous year, when his seizure activity increased to twice weekly. These seizures were described as petit mal but with loss of consciousness and shaking hands and arms according to his spouse, and entailing postical headache (Tr. 151). However, on June 18, 2001, he reported experiencing no seizure activity since resuming treatment with medication (Tr. 149). On August 1, 2001, he reported experiencing no seizure activity recently with treatment, indicating three seizures since the previous examination (apparently June 23, 2001), lasting less than a minute and entailing minimal postictal states (Tr. 146, 148). On October 22, 2001, he reported experiencing seizures entailing "[loss of] function for a while," headaches, and drowsiness, but a decrease in severity, duration, and frequency of the seizures since resuming treatment with medication (Tr. 145). On January 17, 2002, he reported experiencing seizures on October 21 and 22 (presumably 2001), November 22-23 (presumably 2001), a "bad" seizure on December 27 (presumably 2001) and a minimal seizure on January 10 (presumably 2002) (Tr. 143). On April 17, 2002, he reported experiencing one petit mal seizure every 1.5 weeks (Tr. 141). On July 15, 2002, he reported experiencing one seizure monthly for the previous three months, which he believed to be nocturnal but without a verifying witness (Tr. 171).

Examinations revealed obesity, a drooping left eye lid, and back tenderness to palpitation, but also that the plaintiff was alert, oriented in three spheres, demonstrated

normal psychiatric functioning and good spirits (Tr. 141, 146-48, 151, 174). Examinations also revealed equal round pupils reactive to light and intact extraocular muscles (Tr. 145, 151). Examinations further revealed the absence of extremity clubbing, cyanosis, or extremity edema as well as the absence of seizure activity such as bruising or head trauma (Tr. 141, 145, 148, 151). Examinations revealed good back ranges of motion, normal neurological functioning, including the absence of motor or sensory deficits, intact cranial nerve functioning, and good energy (Tr. 141, 145, 147, 151).

Dr. Jenkins twice noted the plaintiff's antiseizure medication blood level was low (Tr. 148, 154, 173). On one of these occasions his physician noted the plaintiff had recently decreased his dosage, and on both occasions Dr. Jenkins increased the plaintiff's dosage of the medication (Tr. 148, 173). He also noted that the plaintiff's seizures were well-controlled with medication (Tr. 146, 148). He advised the plaintiff to lose weight and twice noted that the plaintiff had lost weight (Tr. 141, 149, 171). The plaintiff reported that his medication eased his anxiety (Tr. 149).

In a brief, handwritten statement dated May 14, 2002, Dr. Jenkins stated the plaintiff was unable to work due to continued seizures despite medication. In a brief, handwritten statement dated May 5, 2003, Dr. Jenkins stated the plaintiff was unable to work due to his seizure disorder. In an undated letter, Dr. Jenkins stated that he had treated the plaintiff with medication since June 2001 for an uncontrolled seizure disorder and low back pain and that the plaintiff was unable to work (Tr. 166-67).

On June 12, 2001, the plaintiff was examined by Larry Korn, D.O., a consultative osteopath. The plaintiff reported experiencing one "absence seizure" yearly after surgery for a gunshot wound to the head but that the frequency suddenly increased when he filed for disability in April 2001, after which he requested resumption of treatment with medication in June 2001 and that he was currently taking antiseizure medication and nonprescription medications. He further reported experiencing paranoia, anxiety and social

phobia. He additionally reported completing the ninth grade but failing the tenth grade, that he could read a newspaper, and that he had worked in construction until discontinuing work in April 2001 due to an increase in "absence seizures." Examination revealed the plaintiff was anxious and demonstrated poor gait balance, left visual field defect, absent right knee reflex, and obesity. However, the examination also revealed that the plaintiff demonstrated the abilities to communicate and comprehend adequately and answer all mental status questions without difficulty; normal grooming; ambulation without an assistive device; normal station; intact ranges of motion of the cervical, dorsal, and lumbar portions of the spine; full upper extremity ranges of motion; normal upper extremity strength; the absence of upper extremity crepitus; the absence of upper extremity deformity; the absence of upper extremity edema; normal forearm reflexes; normal lower extremity ranges of motion; normal lower extremity strength; minimal knee crepitus, right more than left; the ability to squat and rise with left knee popping; the absence of lower extremity deformity; the absence of lower extremity edema; normal left knee reflex; normal ankle reflexes; normal cranial nerve functioning, with the exception of inability to lift the left eyebrow, which appeared to be a local defect due to scar tissue; the absence of tremor; slow digital dexterity but without dyssynergia; the ability to rapidly alternate; normal pronation and supination; and the ability to heel/toe walk (Tr. 108-10).

Dr. Korn diagnosed status post gunshot wound with left hemianopsia (blindness in one half of the visual field), equilibrium disturbance, and reported a history of petit mal seizures. He concluded that the plaintiff's cognitive function seemed "fine" but that, due to his hemianopsia and reported seizures, the plaintiff was restricted from working around dangerous machinery or dangerous environments, and to work at floor level. He also noted that the plaintiff's long history of construction work was inconsistent with his hand-to-eye coordination and digital dexterity difficulties (Tr. 110).

On July 10, 2001, the plaintiff was examined by David E. Massey, Ph.D., a consultative licensed clinical psychologist, on July 10, 2001. The plaintiff reported a history of seizures and paranoia. He also reported that he was "kicked out of school" in tenth grade due to fighting and began working as a construction laborer, in which work he was employed until April 2001, when he discontinued working due to balance difficulty and seizures. He further reported that he had recently begun antiseizure medication and that he had not experienced a seizure since June 4 (presumably 2001). He additionally reported he had never had and was not currently undergoing counseling. He also reported that he was constructing an addition to his house with difficulty driving nails, shopped with his significant other, and that he had recently begun attending church services (Tr. 111-13).

Examination revealed that the plaintiff was oriented in all spheres, polite, cooperative, and demonstrated the ability to converse. Examination also revealed the absence of confusion or concentration difficulty, a normal mood, and the absence of emotional lability. Dr. Massey diagnosed an anxiety disorder and a history of a brain injury with resultant seizures controlled by medication (Tr. 111-12).

Opthalmologic examination on August 22, 2001, revealed best corrected visual acuity of 20/20 in the right eye and light perception only in the left eye, normal right eye color perception, normal muscle function, 44% loss of right eye visual field and 68% loss of left eye visual field, 59.4% right eye visual field efficiency, and the absence of useful binocular vision. The plaintiff was diagnosed with stable left hemianopsia. It was concluded that he should avoid hazardous activity and working conditions (Tr. 114-17).

On September 17, 2001, a State agency physician determined the plaintiff retained the physical residual functional capacity (RFC) to lift 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit six hours in an eight-hour workday; push/pull within his lifting capacity; stoop, kneel, and crouch frequently; climb, balance, and crawl occasionally; and perform work allowing a restricted left eye visual field and avoidance

of even moderate exposure to hazards; and that he had no manipulative or communicative or other visual or environmental limitations (Tr. 134-37).

In a statement dated May 8, 2002, the plaintiff reported he cared for his personal needs with assistance in reminding him to take medication, performed limited household cleaning and other chores, tended houseplants, crocheted, and visited others. He also reported he took Valium (Tr. 96-98).

On May 24, 2002, a State agency physician determined the plaintiff retained the physical RFC to lift 50 pounds occasionally and 25 pounds frequently; stand and/or walk and sit six hours in an eight-hour workday; push/pull within his lifting capacity; climb ramps and stairs, stoop, kneel crouch, and crawl frequently; perform work allowing restricted visual fields; and perform work not requiring ladder, rope or scaffold climbing or any exposure to hazards; and that he had no manipulative or communicative or other visual or environmental limitations (Tr. 156-59).

### *Hearing Testimony of Plaintiff*

At his hearing on August 1, 2003, the plaintiff testified he had a seizure disorder and currently experienced two or three seizures weekly, described as entailing "just [standing] there," dropping things, responding to an instruction to lie down, and postictal headache, and infrequent nocturnal seizures described as "just [not feel]ing right," urinary incontinence, disorientation, and postictal headache, for which he took medication (Tr. 225-28, 230-31, 236-37, 240-41). He also testified that he head a left eye visual deficit and back pain for which he had sought no evaluation but for which he took medication that was effective (Tr. 228-30, 232-33, 237-40). He further testified he performed household cleaning and other chores and mowed both his and his neighbor's lawns with a riding mower (Tr. 225-26, 241-42). He additionally testified he cared for both his ailing father and grandmother, including performing household cleaning and other chores, three or four times

monthly, for which he was paid $100 monthly until his sister had assumed the task the month previously, and that he earned money collecting cans (Tr. 198-201, 210-12).

### *Hearing Testimony of Plaintiff's Spouse*

The plaintiff's spouse testified that the plaintiff had seizures two or three times weekly which she described as dropping things, needing to be seated to prevent falling, rotating his hands into his torso, "look[ing] funny" or with wild appearing eyes, looking as though he had a bad taste in his mouth, and remembering nothing of the episode (Tr. 246-49). She also testified the plaintiff assisted her in performing household cleaning and other chores for his grandmother (Tr. 250-51).

### *Hearing Testimony of Vocational Expert*

Vocational expert Karl Weedon testified that, considering an individual of the plaintiff's age, education, past relevant work experience, and RFC to lift 20 pounds occasionally and 10 pounds frequently, stand and/or walk and sit six hours in an eight-hour workday; push/pull within his lifting capacity; stoop, kneel, and crouch frequently; climb, balance, and crawl occasionally; and perform work allowing a restricted left eye visual field and avoidance of even moderate exposure to hazards, jobs existed in the regional and national economies which such an individual could perform (Tr. 134-37, 251-52). He cited light inspector, grader/sorter, and assembler, and sedentary inspector and assembler as examples, and provided the incidence of these jobs in the regional and national economies (Tr. 252-53).

### *Administrative Decision*

The ALJ followed the five-step sequential evaluation process to determine that the plaintiff was not disabled. At the first step, she found the plaintiff had not engaged in

substantial gainful activity since the alleged onset of disability (Tr. 21, Finding 2). At the second step, the ALJ found that the plaintiff suffered from an impairment or a combination of impairments considered "severe" (Tr. 21, Finding 3). At the third step of the sequential evaluation, however, the ALJ found that the plaintiff's impairments did not meet or medically equal a listed impairment (Tr. 21, Finding 4).

At the fourth step, the ALJ assessed the plaintiff's residual functional capacity (RFC) during the insured period and determined that he retains the RFC to perform "a reduced range of light exertion work with limitations", i.e., "lift or carry 20 pounds occasionally and 10 pounds frequently, . . . sit, stand or walk for six hours, each of an eight hour work day, with no limitations regarding pushing or pulling, . . . occasionally climb stairs, balance, and crawl, and . . . frequently stoop, kneel, and crouch . . . avoid even moderate exposure to hazards such as moving machinery and unprotected heights" (Tr. 20-21, Finding 7). In reaching this conclusion, the ALJ considered the relevant medical evidence, all medical opinions, and the hearing testimony regarding the plaintiff's symptoms and limitations, including the plaintiff's subjective complaints. Based upon this RFC, the ALJ found that the plaintiff's impairments precluded him from performing his past relevant work activity (Tr. 21, Finding 8). At the fifth step of the sequential evaluation, the ALJ found that, although the plaintiff could not perform the full range of light work, there were a significant number of jobs in the national economy that he could perform (Tr. 22, Finding 13). Therefore, the ALJ found that the plaintiff was not under a "disability" as defined by the Social Security Act (Tr. 22, Finding 14).

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and

who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents her from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a); *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82-62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a *prima facie* showing of disability by showing that he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the

national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **ANALYSIS**

The plaintiff contends that the ALJ erred by not giving proper weight to the testimony of treating physician Dr. Kent Jenkins. This argument is without merit.

Normally, the opinion of a treating physician "is entitled to great weight for it reflects an expert judgment based on continuing observation of the patient's condition over a prolonged period of time." *Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983). In *Craig v. Chater,* however, the Fourth Circuit Court of Appeals stated that "precedent does not require that a treating physician's testimony 'be given controlling weight'. . . . [I]f a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." 76 F.3d 585, 590 (4th Cir. 1996). If not entitled to controlling weight, the value of the opinion must be weighed, and the ALJ must consider: (1) the physician's length of treatment of the claimant, (2) the physician's frequency of examination, (3) the nature and extent of the treatment relationship, (4) the support of the physician's opinion afforded by the medical evidence of record, (5) the consistency of the opinion with the record as a whole, and (6) the specialization of the treating physician. 20 C.F.R. § 404.1527(d)(2). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical opinions. These are administrative findings reserved for the Commissioner's determination. Social Security Ruling 96-2p.

This court agrees that Dr. Jenkins' opinion is not entitled to controlling weight. His opinions are not supported by the substantial evidence in the record. His opinion is inconsistent with the objective medical findings of Dr. Korn. Indeed, Dr. Jenkins' opinion is not supported by his own treatment notes which reported that the plaintiff's seizures were well-controlled with medication and last indicated that the plaintiff reported having one seizure per month, which the plaintiff believed to occur while he slept. Moreover, Dr. Jenkins practices family medicine; there is no evidence that he is a specialist in seizure disorders or other neurological impairments. He provided no specific physical functional limitations upon which he based his conclusion. As the plaintiff concedes, Dr. Jenkins' opinion cannot resolve the resolve the ultimate issue of disability, which is reserved for the

Commissioner. *Thomas v. Celebrezze*, 331 F.2d 541, 545-46 (4th Cir. 1964). These factors support the ALJ's consideration of Dr. Jenkins' opinion, and this court finds no error. *See* 20 C.F.R. §404.1527(d)(2).

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court concludes the ALJ's findings are supported by substantial evidence and recommends the decision of the Commissioner be affirmed.

s/William M. Catoe<br>
United States Magistrate Judge

August 25, 2005

Greenville, South Carolina